IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBORAH SUE SPICER,           )
                              )
    Plaintiff,                )   Civil No. 03-6377-TC
                              )
    v.                        )   ORDER
                              )
CASCADE HEALTH SERVICES, INC, )
an Oregon corporation,        )
                              )
    Defendant.                )
_____)

COFFIN, Magistrate Judge.

Plaintiff Deborah Spicer was hired by defendant Cascade Health Services ("CHS") in 1997 as a part-time RN Nursing Supervisor. The following is a thumbnail sketch of relevant facts that a jury could reasonably find occurred during her tenure at CHS.

In 1998, Spicer was promoted to a full-time position as a Nursing Services Manager, a capacity in which she supervised the Emergency Room and the Intensive Care Unit. In 2001, her

1 - ORDER

job title changed to Nursing Administration Team Leader, but her responsibilities were not changed. From 1997 to 2002, plaintiff was supervised by Pam Steinke. In February 2002, however, Jody Holland was appointed Leader Manager over the team leaders, and became plaintiff's immediate supervisor. From the outset of this relationship, plaintiff had issues with Holland's supervision.

In late March 2002, Spicer requested and received approximately four weeks of leave to receive treatment for Post-Traumatic Stress Disorder ("PTSD").[1] This leave was taken pursuant to the Family and Medical Leave Act ("FMLA"). Spicer returned to work on May 6, 2002.

Upon her return to work, plaintiff, her husband, and Steinke (who was now the vice-president of patient services) together drafted a document intended to address stresses suffered by plaintiff on the job. This "Work Plan" called for plaintiff to work no more than eight-hour days and to avoid taking work home. Plaintiff would also limit the number of meetings she would attend, and would delegate additional clerical work to another employee. Sometime in May, Steinke began keeping a log of plaintiff's activities.

In early June, plaintiff's supervisor reported to the CHS CEO that plaintiff was in her office crying. The CEO went to plaintiff and told her that she would be on administrative leave for the next five days, and wrote a memo for her personnel file that indicated she was having difficulties and was not abiding by the work plan.

Later that month, Steinke asked plaintiff to participate in a performance evaluation to test out new evaluation software that had been acquired. Although only eight months had passed since her last evaluation, and evaluations were usually only conducted once per year, plaintiff agreed.

During this time, plaintiff's relationship with Holland had not improved, and in September

---

[1] Plaintiff was diagnosed with PTSD in October 2000.

2 - ORDER

2002 plaintiff and Holland entered into an "interaction agreement" to specify appropriate ways for the two of them to communicate. This sort of agreement had been used by Cascade before to mitigate problems between employees. The agreement in this instance provided each individual with guidance on how to deal with the other, and also transferred plaintiff's responsibility for ICU supervision to Holland.[2] Plaintiff opposed the transfer, and informed Steinke that she needed secretarial assistance, not the removal of job responsibilities. Supervision of the ICU was still transferred to Holland, although at some point plaintiff was provided with extra secretarial support.[3] Although supervision of the ICU had been transferred to Holland, plaintiff had begun a number of longer-term tasks related to ICU operations that she continued to work on.

Plaintiff's supervisory role in the ER continued. In the latter months of 2002, however, she had either inaccurately forecasted or been erroneously advised about the amount of work that would be required to prepare the ER for an ISO audit, and in December 2002 it was clear that much work needed to be done. She was chastised for not having the materials ready, and advised that if she was unable to adequately complete her responsibilities, her job might be on the line.

In January 2003, plaintiff underwent her annual performance evaluation. Her overall score remained the same as it had been in past evaluations - "Fully Effective" - although some of the subscores had dropped. Plaintiff, as well as at least one other employee, was also given a notice of "corrective action" due to her failure to meet deadlines for completing evaluations for caregivers she

---

[2]The precise rationale for the transfer is disputed, but Steinke - who approved the transfer - testified that plaintiff was not adequately supervising the ICU, that some complaints had been filed regarding her management, and that plaintiff had informed her that she (plaintiff) was carrying too large and too stressful a workload.

[3]The adequacy and timeliness of the secretarial support - as well as other support requests, such as a request for a "positive support person" - is disputed by plaintiff.

3 - ORDER

supervised.

On February 10, 2003, plaintiff was denied a merit pay raise due to performance deficiencies, and was advised that she would get the raise once her performance improved. A peer of plaintiff, who had received the same evaluation score, was similarly denied a raise.

In late April 2003, Holland informed plaintiff that she (Holland) would be doing plaintiff's budget variances in the future.[4] Holland made the decision to take over the variances when informed that the OPS team wanted more comprehensive variance reporting than had been done to date.

The next day, plaintiff emailed Steinke, threatening to bring an ADA suit against the hospital because of the removal of her job responsibilities and Holland's abuse. That day, plaintiff was switched from Holland's supervision to Ruth Brumagin's supervision. At that time, Brumagin began keeping notes on plaintiff's activities similar to that previously done by Steinke.

The following day, plaintiff was advised that, pursuant to a hospital-wide restructuring, the ER supervisor position was being cut to half-time. Approximately thirty-nine other positions were also reduced in hours or cut entirely. As part of the restructuring, the nursing leadership structure was also revised, with the result that plaintiff would be demoted from her team leader position to a half-time nursing coordinator position. Holland and Jan McMaster, who were nursing team leader coordinators, were demoted to team leaders. Oversight of the ER was given to Brumagin. Plaintiff's pay would be converted to hourly, but would pay at a rate commensurate with her salaried management pay. The restructuring became effective July 8, 2003.

Between those dates - April 23, when plaintiff was advised she would be moved to nursing

---

[4]Budget variances are the analyses managers undertake when a variance exists between the department's budget and actual expenditures.

4 - ORDER

coordinator, and July 8, when the move would be effective - plaintiff took off 33 days from work. The day after she began her part-time position (July 8, 2003), plaintiff began a three-week period of FMLA leave to undergo bariatric surgery. On July 23, 2003, while she was on leave, plaintiff filed a charge with the EEOC alleging ADA violations.

Plaintiff returned to work on September 2, 2003. Upon her return, plaintiff was notified that her office was being relocated to the human resources area, and that the nursing coordinator position description was being modified. Greater emphasis was placed on data collection and patient services statistics. Plaintiff put in an application for additional hours working as an RN in the ER. Due to complications from her surgery, plaintiff was out from work again between September 15, 2003 and October 6, 2003, and the application was not acted upon.

On October 7, 2003, plaintiff asked about the status of her application, and was advised by Brumagin that before she could work as an ER nurse, she would have to take refresher courses in caregiving first, and would need to complete six successful months in her nursing coordinator position. That day, Spicer, on the recommendation of her therapist, quit her employment at CHS.

On November 28, 2003, plaintiff filed the instant action against CHS. In her second amended complaint, plaintiff alleges violations of: the federal Family and Medical Leave Act and the state Oregon Family Leave Act; the federal Americans with Disabilities Act and state laws prohibiting disability discrimination; various provisions in those statutes prohibiting retaliation; and the obligation of an employer to abide by a duty of good faith and deal fairly with its employees. Defendant seeks summary judgment in its favor on all of plaintiff's claims.

## STANDARD OF REVIEW

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions,

5 - ORDER

answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); Bahn v. NME Hosp's, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party must carry the initial burden of proof. This burden is met through identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Id. The facts on which the opponent relies must be admissible at trial, although they need not be presented in admissible form for the purposes of opposing the summary judgment motion. Id.

The court must view the evidence in the light most favorable to the nonmoving party. Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Valadingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. Sankovich v. Insurance Co. Of North America, 638 F.2d 136, 140 (9th Cir. 1981).

Deference to the non-moving party does have some limit. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 587 (1986). The "mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient." Anderson v. Liberty Lobby Inc., 477 U.S.

242, 252 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 248. However, trial courts should act with caution in granting summary judgment, and may deny summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## DISCUSSION

### I. Plaintiff's FMLA/OFLA claims

Plaintiff's FMLA claims and her OFLA claims rely on the same factual allegations; hence, since the OFLA is to be construed "in a manner that is consistent with any similar provisions of the FMLA," Price v. Multnomah Cty., 132 F.Supp.2d 1290, 1295 (D.Or. 2001),[5] they are subject, for purposes of the instant case, to the same analysis.

Upon review of plaintiff's extensive brief opposing defendant's motion for summary judgment, it is apparent to the court that plaintiff alleges that essentially all employment actions taken by CHS after March 2002 were violations of the FMLA. However, based on the pleadings, depositions, and affidavits filed by the parties, no reasonable jury could conclude that any of the actions alleged violated the FMLA.

The FMLA allows qualifying employees to take up to 12 weeks of unpaid leave for various purposes, 29 U.S.C. § 2612(a), and gives those employees the right to be restored to their position or to a position equivalent in benefits, pay, and conditions of employment upon their return to work. 29 U.S.C. § 2614(a). The act further provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]" and that "[i]t shall be unlawful for any employer to discharge or in any other way discriminate

---

[5]See also ORS 659A.186(2); OAR 839-009-0220(2).

7 - ORDER

against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615. The FMLA does not, however, entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave. 29 U.S.C. § 2614(a)(3)(B). "[The FMLA] simply guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions." Liu v. Amway Corp., 347 F.3d 1125, 1132 (9th Cir. 2003).

It is not disputed that plaintiff was a qualified employee or that her two significant periods of leave were protected by the FMLA. However, plaintiff alleges that defendant failed to protect her entitlement to leave, failed to restore her to the same or an equivalent position after each of the FMLA-protected leaves she took, and discriminated against her for opposing unlawful practices regarding such leave.[6] On the evidence submitted, these allegations are simply untenable.

First, and most clearly, there is no evidence that defendant failed to protect plaintiff's entitlement to leave. Indeed, in the relevant eighteen months of plaintiff's employment, she took two separate periods of FMLA leave, totaling over 9 weeks of leave. Plaintiff has presented no evidence that defendants did anything to prevent or interfere with her taking either of those periods of leave; indeed, Steinke actually assisted plaintiff in securing her first period of FMLA leave by working with her to find a suitable location for in-patient treatment of her PTSD. Further, plaintiff herself testified that she didn't believe Steinke objected to her taking the time off. That plaintiff was again allowed to take FMLA leave just over a year later to allow her to undergo bariatric surgery is even stronger evidence that CHS did not fail to protect her entitlement to FMLA leave.

---

[6]Plaintiff, in her briefing, also describes her FMLA claim as grounded in the "interference" prohibition of § 2615(a)(1). Defendant accurately notes that this claim is absent from her original or either of her two amended complaints. Regardless, for the same reasons her properly pleaded FMLA claims fail, her "interference" theory also fails.

8 - ORDER

Similarly, the evidence that CHS failed to restore plaintiff to her prior positions in violation of the FMLA is insufficient to withstand summary judgment. There is no real dispute that plaintiff had the same job after her April 2002 FLMA leave as she did before she took the leave. Although plaintiff argues that some of the conditions changed, most of the alleged changes occurred substantially after she returned from leave, and there is no evidence of any causal connection between the employment action and her taking the leave.[7] The only changes to her employment that occurred very shortly after her return from leave were the imposition[8] of a work plan and plaintiff's supervisor taking notes regarding plaintiff. These changes, however, did not materially alter her position. Her pay was not impacted, she enjoyed essentially the same responsibilities,[9] and there was no provision in the plan for penalizing plaintiff should she not abide by it. The manifest design behind the plan was to decrease the hours plaintiff needed to work to get her job done and reduce the stress involved in accomplishing her tasks, without decreasing her responsibilities or pay. Given her diagnosis of PTSD, the impetus behind such an implementation seems clear. Regardless,

---

[7]Other cases examining temporal proximity have found that even if the event is proximate in time to the leave or the manifestation of an intent to take FMLA leave, such is insufficient to withstand summary judgment in the absence of other evidence of causation. See, e.g., Skrjanc v. Great Lakes Power Service, 272 F.3d 309, 317 (6th Cir. 2001) ("This leaves [plaintiff] with nothing more than the proximity in time between the date he informed Great Lakes Service of his intention to take a leave of absence and his discharge one month later. But such temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.").

[8]Defendant argues that there was no "imposition" of a work plan but that it was agreed to by plaintiff and CHS.

[9]To the extent the plan called for her to send representatives to various meetings instead of attending those meetings herself, there was some impact on her responsibilities. However, as noted, there was no provision in the plan to penalizing plaintiff if she acted contrary to the plan and, for example, attended the meetings herself. In any event, plaintiff herself testified that she had the same overall responsibilities upon her return from leave - i.e., management of the ER and the ICU.

9 - ORDER

plaintiff's characterization of it as an adverse employment action is better directed at her ADA claim that she was discriminated against by virtue of her disability than at her FMLA claim that she was not restored to the same position upon her return from leave.

Finally, the only evidence that could be construed as "opposition" to unlawful FMLA activity is evidence that plaintiff complained or protested some of the actions taken by defendant - which, as described above, cannot be said to have violated the FMLA. Such complaints or criticisms cannot be themselves actionable.

Because no rational trier of fact could find that defendant violated the FMLA or the OFLA, plaintiff's first and second claims for relief are dismissed.

## II. Plaintiff's ADA/state disability discrimination law claims

Plaintiff's third and fourth claims, alleging disability discrimination, rely on the same factual allegations. Again, Oregon laws on disability discrimination are to be construed in a manner consistent with the federal ADA. ORS 659A.139. Therefore, the claims will be discussed together.

Plaintiff alleges that she has actionable ADA claims in four different categories: unwelcome harassment; adverse employment actions; failures to accommodate; and intimidation/interference with her statutory rights. See, e.g., Farley v. Nationwide Mutual, 197 F.3d 1322, 1334 (11th Cir. 1999). I find that a reasonable jury, on the evidence before me, could conclude that plaintiff suffered violations of the ADA.

Defendant attacks plaintiff's allegations primarily on the basis of causation; i.e., that plaintiff cannot prove that any of the allegedly harassing behavior, any alleged interference, and any alleged

10 - ORDER

adverse employment actions were taken because of her disability.[10] However, a reasonable jury, viewing the facts as described earlier, could so find. Upon her return to work after taking FMLA leave for treatment of her disabling condition, plaintiff was immediately put on a "work plan" which potentially impacted her ability to do her job; a clear inference can be made that the "work plan" was designed to help plaintiff manage stress from her job - an issue raised by her PTSD diagnosis. At the same time, plaintiff's activities were logged by her supervisor - something apparently not typically done at CHS. A jury could find that these were harassment, interference, or (potentially) adverse employment actions[11] taken as a result of her disability.

Similarly, the removal of ICU supervision in 2002 could be seen as action taken because of plaintiff's disability. Although the basis for the transfer of responsibilities is disputed, there is sufficient evidence such that a jury could find that the transfer was an adverse employment action taken because of restrictions placed upon plaintiff because of her disability, or was the result of a failure to accommodate plaintiff's disability.

The other factual allegations plaintiff brings - such as the shift to half-time, the removal of ER supervisory responsibilities, and the move to a position of entirely lesser responsibilities - have less evidence suggesting a connection to her disability, but, particularly when considered with the above allegations, present enough of a question that a jury should be allowed to consider them both as evidence of violations themselves and as part of the fuller picture.

---

[10]Defendant concedes for purposes of the motion for summary judgment that plaintiff has at least a triable issue on whether she suffers a qualified disability; therefore, it is assumed for this analysis that she is so disabled.

[11]If, for example, plaintiff can show that she was later denied her merit increase because she was unable to adequately do her job due to the restrictions imposed by the work plan, such could be an adverse employment action.

11 - ORDER

Defendant's motion for summary judgment on plaintiff's ADA and state law discrimination claims is denied.[12]

### III. Plaintiff's good faith and fair dealing claim

Plaintiff alleges that defendant violated its duty of good faith and fair dealing in the performance of the employment relationship between the parties. However, that duty comes about not simply by the creation of an employment relationship but by the creation of a contract. See, e.g., Restatement (Second) Contracts, § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.") (emphasis supplied); Williston, Contracts 15, § 670 ("There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.") (emphasis supplied).

It is undisputed that plaintiff did not have an employment contract with CHS, but that she was an at-will employee. Indeed, in her deposition, plaintiff testified as follows:

> Q: At any time in your employment with Cascade did you ever sign any kind of document that suggested to you that your employment with Cascade would be for a certain amount of time?
>
> A: No.
>
> ...
>
> Q: Did anybody promise you anything while you were working at Cascade that

---

[12]For the same reasons that a reasonable jury could find that some of CHS' actions support plaintiff's disability discrimination claims, it could find that those actions were taken out of retaliatory animus for her engaging in protected activity under the ADA; to wit., challenging the accommodations, or lack thereof, she was given; opposing the removal of her job responsibilities; and filing a charge with the EEOC alleging, inter alia, that defendant violated the ADA in its treatment of her. Her retaliation claim, therefore, survives summary judgment as well, insofar as it alleges retaliation based on protected conduct under the ADA or state disability discrimination law.

12 - ORDER

>               you feel you did not get?
>
> A:     I do not recall.

Deposition of Deborah Spicer (#31, Ex. 1) at 17-18. Plaintiff alleges, however, that the employment handbook prepared by defendant nonetheless created an enforceable contract between the parties. This allegation ignores the disclaimer in the handbook, signed on two separate occasions by plaintiff, which specifically stated that plaintiff acknowledged that the handbook was "not to be considered as a contract of employment." Declaration of James Dover (#37), Exs. 1-2. Such disclaimers are valid under Oregon law. See Mobley v. Manheim Services Corp., 133 Or.App. 89, 95 (Or. App. 1995).

Plaintiff agrees that the at-will nature of her employment bars any claim she might have for her termination, but maintains that CHS had a duty of good faith and fair dealing during the employment relationship, citing to Elliott v. Tektronix, Inc., 102 Or. App. 388 (Or. App 1990) in support of the proposition. Elliott, however, merely noted that in at-will employment relationships, if the parties nevertheless contractually agree to restrict rights (such as the right to terminate without cause), the duty of good faith applies to the restrictive terms of their agreement. Id. at 396. Because plaintiff here had no reasonable expectation that the provisions of the employee handbook created contractual obligations on the part of defendant, she cannot maintain a claim, premised on contract grounds, for a breach of the duty of good faith and fair dealing. Summary judgment on this claim is granted in favor of defendant.

## CONCLUSION

Defendant's motion (#33) and supplemental motion (#47) for summary judgment are granted in part and denied in part as follows: they are granted as to plaintiff's FMLA, OFLA, and good faith

13 - ORDER

and fair dealing claims; they are denied as to plaintiff's ADA and state disability discrimination law claims and plaintiff's retaliation claim, insofar as it deals with retaliatory conduct motivated by plaintiff's engaging in conduct protected by the ADA and state disability discrimination laws.

DATED this 9th day of September, 2005.

Thomas M. Coffin
United States Magistrate Judge

14 - ORDER